622 So.2d 1066 (1993)
STATE of Florida, Appellant,
v.
GLOBE COMMUNICATIONS CORPORATION, Appellee.
No. 91-3112.
District Court of Appeal of Florida, Fourth District.
August 4, 1993.
*1067 Robert A. Butterworth, Atty. Gen., Tallahassee, and Richard L. Polin, Asst. Atty. Gen., Dept. of Legal Affairs, Miami, for appellant.
Carey Haughwout and John F. Tierney, III of Tierney & Haughwout, West Palm Beach, for appellee.
Richard J. Ovelmen of Baker & McKenzie, Miami, for amici curiae  The Miami Herald Pub. Co., Nat. Broadcasting Co., Inc., The New York Times Co., The American Civil Liberties Union, The Reporters Committee for Freedom of the Press, The Florida First Amendment Foundation and Gannett Co., Inc.
Bruce W. Sanford, Henry S. Hoberman and Robert D. Lystad of Baker & Hostetler, Washington, D.C., for Amicus Curiae-Society of Professional Journalists.
George K. Rahdert of Rahdert & Anderson, St. Petersburg, for amicus curiae  The Times Pub. Co.
ANSTEAD, Judge.
We affirm the trial court's order holding that section 794.03, Florida Statutes (1987), which mandates criminal sanctions for anyone who identifies a victim of a sexual offense in any instrument of mass communication, violates free speech and free press provisions of the Constitutions of Florida and the United States, both on its face and in the way it is sought to be applied to the appellee newspaper, Globe Communications Corporation in this case.[1]
Section 794.03 prohibits anyone from "print[ing], publish[ing], or broadcast[ing] ... in any instrument of mass communication" the name or other information identifying a victim of a sexual offense. The trial court held the statute did not pass muster under the First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, both on its face and as applied to Globe in this case, because it is overbroad, underinclusive, and constitutes a prior restraint on protected speech. The ruling is primarily based upon the decision in The Florida Star v. B.J.F., 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), wherein the Supreme Court struck down an award of civil damages predicated upon a violation of section 794.03. In addition, the trial court ruled that the statute was violative of Article I, Section 4 of the Florida Constitution because the protection afforded by this provision is at least as broad as the protection afforded by the First Amendment.
In its brief, the state concedes record support exists for the lower court's conclusion that section 794.03 is unconstitutional as applied to Globe under the facts of this case. Consequently, this appeal is limited to the issue of the facial constitutionality of the statute.
*1068 We are in general agreement with the thorough and scholarly opinion of the trial court and we will limit our own observations to parts of the opinion which we conclude require qualification or further explanation. However, we commend the trial court for the extent and quality of its analysis which has not only facilitated our review, but also sets out the facts and the law in a way which is informative and helpful to the legal community and the public alike.
Because we are in general agreement with the trial court's opinion, we quote it here verbatim and in full:
The State of Florida, by its State Attorney, has filed a sworn information in two counts charging that defendant, GLOBE COMMUNICATIONS CORP., did in Palm Beach County, Florida, unlawfully print, publish, or cause to be printed or published in an instrument of mass communication the name, photograph, or other identifying fact or information of the victim of a sexual offense within Chapter 794, Florida Statutes, contrary to Fla. Stat. 794.03. Count One alleges a criminal act in violation of the statute as having occurred on or about April 23, 1991, and Count Two alleges a similar act as having occurred on or about April 30, 1991. A violation of this statute has been denominated by the legislature as a misdemeanor of the second degree.
Defendant through counsel has filed a Motion to Dismiss the Information with numerous attachments consisting of affidavits of corporate officers, employees and third persons who purportedly have knowledge of the sexual battery alleged to have been committed by William Kennedy Smith on a local Palm Beach County woman, Patti Bowman. A trial of the alleged sexual battery will take place in the not too distant future in the Circuit Court of Palm Beach County. This trial will probably become the most celebrated and well-publicized judicial proceeding in America for the year 1991, if it lives up to its advanced billing.
From the affidavits on file in this matter, and from testimony and evidence taken on September 25 to 27, 1991, I find that after the alleged rape was reported to police, Kenneth Harrell, a Globe reporter, launched an investigation into the circumstances of the rape by conventional investigative methods. He interviewed a number of employees and patrons at several Palm Beach bistros that were patronized by the victim and the Kennedys on the night of the incident. These conversations culminated in an interview by Harrell of a Mrs. Elizabeth Ashley Murphy, who claimed to know what happened at the Kennedy estate, and the name of the person claiming to have been assaulted by Smith.
With information thus obtained, Mr. Harrell obtained the victim's address on April 2, 1991, and went there to stake out her home. On arrival, he found that reporters from the "Sunday Mirror", a London tabloid, and the "The Star", an American tabloid, had beaten him to the scene and already had the victim's home and occupants under surveillance. Within hours of Harrell's arrival reporters from the "Boston Herald" and the "New York Post" arrived to begin surveillance of the premises.
From conversations with his competitors, Harrell learned that they already had ascertained the victim's identity. As the days progressed, a small army of reporters encamped about the victim's home, with many attempting to communicate with its inhabitants.
On April 4, Harrell approached an individual about to enter the victim's home who identified himself as Denny Abbott, a coordinator for the Victim Services Section, an agency of the Board of County Commissioners of Palm Beach County. He informed Abbott that he was seeking an interview with the victim and named her. Abbott informed Harrell and other reporters at the scene that he, Abbott, was here to talk with the victim and to offer her advice on the kind of help she might receive from the County. Harrell asked Abbott to take a written message inside and deliver it to the victim, which *1069 Abbott stated he would do. Because the county's victim coordinator, Abbott, was present, the reporters present concluded that circumstantially, the victim's identity and the fact that she resided at this house in Jupiter, had been confirmed.
During the week of April 1, 1991, Harrell revisited a number of bars in Palm Beach, seeking additional information. He was able to develop the name of a former fiancee of the victim, one Eugene Kim Schuman. On April 6, 1991, Harrell and Frank Geary interviewed Mr. Schuman and his former brother-in-law, Kevin Krause. Both Schuman and Krause indicated that they knew the woman who was the accuser and confirmed her identity to Harrell. A local woman, Betsy Martin, also confirmed the victim's identity in a phone conversation with Mr. Harrell. He further confirmed her identity in a conversation with Mary Barley, an acquaintance of the victim and Mr. Schuman when they resided in Winter Park, Florida.
Thereafter, in a "Globe" issue bearing publication date of April 23rd but distributed to newsstands as early as April 15th, was issued which published the victim's name and other identifying information. The Globe's issue with a cover date of April 30, 1991, but actually distributed to newsstands as early as April 22nd, also identifies the alleged victim by name.
Between April 5 through April 8, 1991, four different British newspapers including The Sunday Mirror, Today and People, published articles identifying the victim by her name, and one, the "Sunday Mirror," also published the victim's photograph. The "Sunday Mirror" has a circulation of nearly 3,000,000, of which between one and two dozen copies are distributed to newstands [sic] in Palm Beach County. Upon stipulation, I considered the affidavit of Marco Marchetti, an officer of Speedimpex U.S.A., Inc., a corporation in New York which distributes "Today", "People", "Sunday Mirror" and other British newspapers in the United States. He lists numerous locations in Florida and in the U.S. where these publications are sold, including Miami, Orlando, Boca Raton, Chicago, New York, Los Angeles and San Francisco.
On April 16, 1991, NBC News in its 6:30 p.m. (EST) nightly news, broadcast the victim's name. The "New York Times" published the victim's name on April 17, 1991, and numerous other newspapers, magazines, etc., have since carried her name. An information accusing Smith of sexual battery and simple battery of the victim, and naming her, was filed with the Clerk of the Circuit Court of Palm Beach County, Florida, on May 9, 1991, which makes the victim's identity a matter of public record. Since the story involves a Kennedy, it is a national and international media event of the year, one of such magnitude that it is to be doubted that scientists working and living in igloos at the South Pole would be able to remain ignorant of it.
The defendant attacks the statute involved as unconstitutional on its face as a violation of the freedom of speech and of the press provisions of the First Amendment to the Constitution of the United States as applied to the States through the Fourteenth Amendment. It is further contended that the statute, F.S. 794.03 (1990) violates Art. 1, Sec. 4 of the Florida Constitution as an abridgement or restraint on defendant's liberty of speech and of the press. Finally, it is contended that the statute is unconstitutional (violative of the First Amendment) as applied to the facts of this case.
PROCEDURAL ASPECTS OF THE MOTION TO DISMISS
The Motion to Dismiss on constitutional grounds is filed pursuant to Rule 3.190(b), Florida Rules of Criminal Procedure (1991). Defendant denies that it is moving for a dismissal pursuant to subsec. (c)(4) of Rule 3.190.
Upon reading the Motion and the State's traverse I ordered a hearing on the motion pursuant to subsec. (d) of the rule to receive evidence on issues of fact *1070 necessary to a decision on the constitutionality of the statute with which defendant is alleged to have violated. Although the constitutionality of a statute, on its face, is a question of law, the Motion to Dismiss also attacks the constitutionality of the statute, as applied, which is a mixed question of law and fact.
The Motion to Dismiss does not fit the mold of the usual Rule 3.190(c)(4) motion. The usual "(c)(4) motion" takes one of two forms. First, the motion may show the classic affirmative defenses of self-defense, entrapment and insanity. Secondly, the motion might show that the defensive facts sworn to are mutually exclusive to facts the state needs to present its case, such as alibi, an exception in the statute defining the crime, or the defendant's possessory right to property allegedly stolen. See Miller, Rule 3.190(c)(4) Motions  A Fall From Grace, 13 FLA.STATE L.REV. 257, 263 (1985).
Research has disclosed a number of appellate opinions which involved motions to dismiss on grounds of unconstitutionality of a statute, as applied, and none of the following opinions indicate that the motion was being treated as a "(c)(4) motion". See Brown v. State, 358 So.2d 16 (Fla. 1978) (F.S. 847.04, prohibiting "profane, vulgar and indecent speech * * * within the hearing of others" attacked on both facial and "as applied" grounds); Pace v. State, 368 So.2d 340 (Fla. 1979) [F.S. 877.02(1), the antisolicitation of legal business statute attacked on both facial validity and "as applied" grounds]; Roberts v. State, 373 So.2d 672 (Fla. 1979) [F.S. 847.011(7) authorizing seizure of obscene materials was assailed both as facially invalid and unconstitutional as applied]. Orantes v. State, 452 So.2d 68 (Fla. 1st DCA 1984), pet. for rev. den, 461 So.2d 115 (Fla. 1984) (F.S. 893.135, the mandatory drug trafficking sentencing statute attacked on motion as being unconstitutional, as applied). I conclude that the motion in the instant case is not a subs. (c)(4), Rule 3.190 Motion and therefore did not deny the same upon the filing of the State's traverse of the motion.
The importance of determining whether Globe's Motion is a Rule 3.190(c)(4) motion is simply this: if material facts in such a motion are denied by the State, the judge must deny the motion and let the factual issues be resolved by a jury. Miller, Rule 3.190(c)(4) Motions  A Fall from Grace, 13 FLA.STATE L.REV. 257, 268-69 (1985). In determining whether a statute is unconstitutional on its face, the facts are probably irrelevant. Sims v. State, 510 So.2d 1045 (Fla. 1st DCA 1987).
Motions made under Rule 3.190, which do not fall into the subsec. (c)(4) category, may raise factual issues and it is appropriate for the court to resolve them in order to decide whether Fla. Stat. 794.03 is unconstitutional as applied to the facts of this case.
CONSTITUTIONALITY OF FLORIDA STATUTE 794.03
The statute in question, F.S. 794.03, was originally enacted as Sec. 1, Chap. 6226, Laws of Florida, 1911. The question presented by the motion to dismiss is whether the statute is violative of the U.S. Constitution, and particularly the First Amendment thereto as applied to the states through the Fourteenth Amendment.
1. Is Fla. Stat. 794.03 violative of the First Amendment because it is overbroad as a categorical prohibition of media publication of the names of rape victims where the information is truthful, lawfully obtained and involves a matter of public interest? The State of Florida claims with considerable logic that it has a compelling interest in enforcing the statute because victim intrusion-protection laws encourage victims of sexual assaults to report rapes while shielding them from the full glare of media publicity. While thus protected from ridicule, embarrassment and the like, victims are thereby more likely to make reports of such crimes to the authorities. Lastly, the State contends that apprehending and *1071 trying the alleged perpetrators of such crimes is a state interest of the highest order.
However desirable shield laws may be, the enforcement of such laws collides with First Amendment claims of the press to comment freely on a matter of public interest which is what the defendant is accused of doing in the case at bar. Research has disclosed no appellate decision either reversing or sustaining a criminal conviction for the violation of the statute in question.
I note that the United States Supreme Court has considered the analogous question of whether a newspaper may be criminally punished for violating a law designed to protect minors from having their identities disclosed, at least when they are being prosecuted as juvenile offenders. In Smith v. Daily Mail Publishing Co., 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), Daily Mail published the name of a 14 year old youth charged with killing another youth. This publication facially violated a West Virginia statute making it a misdemeanor to publish the name of a youth charged as a juvenile offender without permission of the Juvenile Judge having jurisdiction.
West Virginia argued with considerable logic that it had a compelling state interest in protecting juveniles with the veil of confidentiality. The prosecution contended that confidential handling furthers a juvenile's rehabilitation because publication of his name may encourage future antisocial behavior and cause the juvenile to lose future employment or suffer other adverse consequences for this single offense.

Daily Mail countered that it had lawfully obtained the information which it published by the actions of its reporters, who, routinely monitoring police radio, learned of the shooting, interviewed witnesses to the shooting and also interviewed the police investigators and prosecutors. The juvenile's name and a picture of him were published and such information was truthful.
The Daily Mail Court held that the magnitude of the state's interest in protecting minors was not sufficient to justify the application of a criminal penalty to a newspaper which lawfully obtained the information and published the same in a truthful manner. The Court subordinated the state's interest in protecting and rehabilitating minors to the greater First Amendment interest of the Daily Mail to speak and comment about a matter of public concern.
The Court in Daily Mail noted that a major defect in the West Virginia statute was that it operated as a prior restraint of the exercise of the rights of free speech and free press. No judge had to call a hearing to determine on a case by case basis whether the facts of a particular case necessitated such a restriction on free comment and to narrowly tailor any denial of First Amendment rights to serve that state interest.
In Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 98 S.Ct. 1535 [, 56 L.Ed.2d 1] (1978), a newspaper was prosecuted under a statute forbidding anyone to divulge or publish information concerning the identity of a judge under investigation before a state judicial review commission. The legislative findings to support the statute included a finding that such confidentiality was necessary to encourage victims to file complaints with the commission and to protect witnesses from retaliation or recrimination. The Supreme Court concluded that the newspaper publication Virginia sought to punish lay near the core of the First Amendment, a major purpose of which was to safeguard a free and open discussion of governmental affairs.
In Landmark, the state argued that the use of criminal sanctions to protect the confidentiality of a government activity was a compelling and legitimate state interest of the highest order that must be protected even at the cost of a restraint upon the press. The Supreme Court found that Virginia's interests sought to be advanced by the imposition of criminal penalties were insufficient to justify actual and potential encroachments *1072 on freedom of speech and freedom of the press which resulted from applying the statute.
In Gardner v. Bradenton Herald, Inc., 413 So.2d 10 (Fla. 1982), cert. denied, 459 U.S. 865 [, 103 S.Ct. 143, 74 L.Ed.2d 121] (1982), the Court considered a first amendment challenge to Fla. Stat. 934.091 (1927) making it a third-degree felony for any person to publish in a newspaper, publication or electronic medium the name of any person who is a party to an interception (e.g. a wire or phone tap) of a wire or oral communication until that person has been indicated or informed against. The Florida Supreme Court struck down the statute as an unconstitutional restraint of freedom of the press, finding that the absolute terms of the statute had the effect of an invalid prior restraint on the press.
In Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), a trial judge in Massachusetts closed a criminal trial from the general public under a state statute providing for exclusion of the public and the press in all trials of specified sexual offenses involving a victim under the age of 18. Globe appealed an order prohibiting its representatives from attending hearings in which the defendant was charged with forcible rape and forced unnatural rape of three minor teen-age girls.
The Supreme Court in Globe reversed, holding that the mandatory closure rule of the statute violated Globe's First Amendment right of access. The court reasoned that to deny Globe access it had to be shown that the denial was necessitated by a compelling state interest and that relief is narrowly tailored to serve that interest. The Court recognized the importance of the State's interest in safeguarding the physical and psychological well-being of minors, not from testifying, but rather from the additional injury suffered by them in testifying in the presence of the public and the press. Globe, [457 U.S. at p. 606], 102 S.Ct. at p. 2620. Before closing a proceeding a trial judge should be authorized to determine, on a case-by-case basis, whether closure is necessary by weighing such factors as the minor victim's age, her psychological maturity and understanding, the nature of the crime, and whether the victim or her parents desired closure. A trial judge permitted to hold a hearing on closure and exercising his discretion might well determine that closure was unnecessary. Since the Massachusetts statute did not provide for a hearing, the competing interests of the State and the press could not be determined on a case-by-case basis. The Florida Statute in question is deficient in the same way because it is absolute in its reach and does not provide for a hearing.
Massachusetts attempted to assert a second interest in enforcing the closure statute  the encouragement of minor victims of sex crimes to come forward and provide testimony. The Court rejected this as a compelling State interest, finding that Massachusetts had offered no empirical support for its claim that automatic closure would lead to an increase in number of minor victims coming forward to report sex crimes and to cooperate with the police. Globe, [457 U.S. at pp. 609-610], 102 S.Ct. at pp. 2621, 2622. Since the press under the statute was not denied access to Court personnel, the transcript or other possible sources proving an account of the victim's testimony, the statute thus could not effectively prevent the press from publicizing an account of the victim's testimony, as well as her identity. Justice O'Connor concurred, finding as did the majority, that Massachusetts had demonstrated no interest of sufficient importance to justify an automatic exclusion by the public and the press in all cases.
The U.S. Supreme Court has held that Fla. Stat. 794.03 is unconstitutionally overbroad in The Florida Star v. B.J.F., 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), because the statute requires no case-by-case findings that disclosure about a person's private life was one that a reasonable person would deem offensive. As pointed out in Florida Star: *1073 "* * * (L)iability follows automatically from the act of publication. This is so regardless of whether the victim is already known throughout the community; whether the victim has voluntarily called public attention to the offense; or whether the identity of the victim has otherwise become a reasonable subject of public concern  because perhaps, questions have arisen whether the victim fabricated an assault by a particular person. * * * We have previously noted the impermissibility of categorical prohibitions upon media access where important First Amendment interests are at stake. (Citing Globe Newspaper Co., above). More individualized adjudication is no less indispensable where the State, seeking to safeguard the anonymity of crime victims, sets its face against the publication of their names." (109 S.Ct. at p. 2612)
I find that interviewing private citizens, a coordinator of the County's Victims' Services Section and others and reading other media publications, and yes, by listening to gossip in the bars and clubs of Palm Beach, is a lawful means of acquiring the information published. I also conclude that because the statute imposes a blanket prohibition in publishing the names of all rape victims, without a hearing and a case-by-case determination that restraint of freedom to publish is necessary to accomplish a valid and important State interest, I find and hold today that Florida Statute 794.03 (1990) is unconstitutionally overbroad and that no valid state purpose is served by imposing criminal liability on defendant, The Globe Communications Corp.
I further find the statute is unconstitutional as applied in this case. Miss Bowman's identity as the accuser was widely known to numerous members of the public and the media and her identity had been published by several British tabloid-type newspapers before the Globe published her name. The state's contention that publishing a sexual assault victim's name constitutes a clear and present danger to that victim prior to the identification and apprehension of the alleged perpetrator is a circumstance which, even having some facial validity, is absent in this case. The identity of Miss Bowman's alleged assailant was widely known and his whereabouts and comings and goings were covered virtually on a daily basis by numerous media reporters in another state. In the analogous situation where a judge issues a pretrial "gag order", the Florida Supreme Court has concluded that for such an order to pass constitutional muster, the speech or press activity so restrained must pose a clear and present danger to a competing interest of such dimension that no reasonable alternative is available. State Ex Rel Miami Herald Pub. v. McIntosh, 340 So.2d 904, 908 (Fla. 1977) (dicta).
I find that no threat of a danger to either the criminal justice system or to Miss Bowman's safety occurred when defendant printed the latter's name as alleged in Count I and Count II of the Information.
2. Is Fla. Stat. 794.03 violative of The First Amendment as being underinclusive because it leaves unprohibited appreciable damage to a supposedly valid state interest?

The Florida Star decision analyzed the above statute as applying only if the identifying information concerning a sex crime victim appears in an "instrument of mass communication", whatever that term may mean, as it [is] not further defined by the legislature. ([491 U.S. at pp. 539-541] 109 S.Ct. at pp. 2612, 2613)
The majority of five justices in Florida Star noted that the statute did not prohibit the spread by other means of the identity of victims of sexual offenses. To use Justice Marshall's example, the statute does not apply to "the backyard gossip who tells 50 people that don't have to know". To justify the extraordinary remedy of punishing truthful publication of the victim's name to protect the latter's right of privacy the state must demonstrate its full commitment to furthering this objective, and regulate the small time disseminator as well as the media giants. The initial disclosures in the case at bar came from local gossip in *1074 the manner which Justice Marshall expounded in The Florida Star. With regard to local gossips they had best do it by mouth only. At arguments on October 17th, the State Attorney threatened that "if Mrs. Jones gets a megaphone or copy machine, we'll prosecute her too!"
The majority in The Florida Star found that statute cannot be defended on the ground that partial prohibitions, applying to mass media only, may provide partial relief to sex crime victims. Withoutmore [sic] inclusive precautions against dissemination by informants who are not representatives of large media the selective ban on mass media disclosures cannot be regarded as protecting a state interest of the highest order. (The Florida Star, [491 U.S. at p. 541] 109 S.Ct. at p. 2613)
Justice Scalia concurred in The Florida Star on the ground that the statute was not inclusive enough to justify a restriction upon truthful speech which left all non-mass media disclosures unregulated. ([491 U.S. at p. 541] 109 S.Ct. at p. 2613)
Because the statute has not been amended following the decision in The Florida Star case, I must follow the U.S. Supreme Court's decision in that case as binding on this Court. I therefore hold that the State may not constitutionally punish the defendant, a mass media business, under Fla. Stat. 794.03, for a disclosure prohibited by the State, when all other means and instrumentalities of dissemination are not regulated by the statute.
3. Is Fla. Stat. 794.03 violative of the First Amendment because it functions as a prior restraint?
The statute in question is probably not a "prior restraint" as that term has been traditionally used. It is not always clear what government actions constitute a "prior restraint". See Jeffries, Rethinking Prior Restraint, 92 YALE L.J. 409, 419 (1983). Some prior restraints involve permits or licenses, some involve injunctions (e.g. "gag orders"), some involve neither permits or injunctions but are treated as prior restraints, while others are not so treated. Id., 92 YALE L.J. at p. 419.
Professor Thomas Emerson in his article, The Doctrine of Prior Restraint, 20 LAW & CONTEM.PROBS. 648, 655-56 (1955), proposed categorizing prior restraint into four categories of which his third category includes legislative restraints or statutes which proscribe a subsequent punishment. Rethinking Prior Restraint, 92 Yale L.J. at p. 421. The main difference between injunctions, which are thought to be a traditional form of prior restraint, and a legislative "subsequent punishment" is the timing of the adjudication. An injunction precedes publication while under the statutory system of criminal prosecution, the adjudication comes after publication. Id. at pp. 427, 428.
Does it make any difference what label we place on Fla. Stat. 794.03, one of "prior restraint" or "subsequent punishment"? [sic] Probably not. Because "prior restraint" has been used in such a number of dissimilar situations the term may have lost much of its utility as an aide [sic] to first amendment analysis. Id. 92 YALE L.J. at p. 434.
In Gardner v. Bradenton Herald, Inc. 413 So.2d 10 (Fla. 1982), cert. denied, 459 U.S. 865 [103 S.Ct. 143, 74 L.Ed.2d 121] (1982), the Florida Supreme Court appears to use prior restraint and subsequent punishment as interchangeable terms when the Court states:
"* * * The absolute terms of this statute effectively result in a prior restraint on the press. Prior restraints have always been accorded the most exacting judicial scrutiny. Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); South Eastern Promotions, Ltd. v. Conrad 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). The United States Supreme Court had made it clear that the method of imposing restrictions on the press is not the critical factor:

*1075 `Whether we view the statute as a prior restraint or as a penal sanction for publishing lawfully obtained, truthful information is not dispositive because even the latter action requires the highest form of state interest to sustain its validity.'

"Smith v. Daily Mail Publishing Co., 443 U.S. 97, 101-02, 99 S.Ct. 2667, 2669-70, 61 L.Ed.2d Ed. [sic] 399 (1979). The Supreme Court has recently defined the relevant Constitutional Standards in Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), and then commented in Daily Mail that "State action to punish the publication of truthful information seldom can satisfy" such standards. 443 U.S. at 101-2, 99 S.Ct. at 2669-70 [61 L.Ed.2d 399]." (413 So.2d at p. 11)
For other cases recognizing the elimination of any semantic differences between the terms "prior restraint" and subsequent punishment, see, Worrell Newspapers of Indiana, Inc. v. Westhafer, 739 F.2d 1219, 1222 (7th Cir.1984) (dicta.) [aff'd, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985)]; Cate v. Oldham, 707 F.2d 1176, 1186 (11th Cir. 1983).
It no longer makes any difference whether the restriction comes in the form of an injunction or in the form of a penal "subsequent punishment" under federal or state decisional law. Both forms of restraint are subject to careful review which requires the "highest form of state interest to sustain (their) validity". Daily Mail, 443 U.S. 97, 102, 99 S.Ct. 2667, 2670, [61 L.Ed.2d 399] Gardner v. Bradenton Herald, Inc., 413 So.2d at p. 11.
In the analysis of the statute in question, I have already addressed the overbreadth issue. I have found the statute is constitutionally infirm because no valid competing state interest is served by punishing defendant for publishing a truthful account of information it had lawfully acquired.
4. Is Fla. Stat. 794.03 violative of Art. 1, Sec. 4 of the Florida Constitution as a restraint or abridgement of the liberties of speech and the press?
The Florida courts have tended to merge discussion of the limitations upon freedom of speech and of the press contained in Art 1, Sec. 4, of the FLA. CONST. and the First Amend., U.S. CONST. to the point that cases from Florida courts and from the federal courts are cited interchangeably. See Department of Educ. v. Lewis, 416 So.2d 455 at p. 461 (Fla. 1982), Florida Canner's Assn. v. State, Dept. of Citrus, 371 So.2d 503 at p. 517 (Fla. 2d DCA 1979)[, aff'd, 406 So.2d 1079 (Fla. 1981), appeal denied, 456 U.S. 1002, 102 S.Ct. 2288, 73 L.Ed.2d 1297 (1982)]; In Re Advisory Opinion to the Governor, 509 So.2d 292, 302, Footnote 2 (Fla. 1987). In the absence of a contrary controlling precedent in Florida, I must therefore assume that the protections afforded by Art. 1, Sec. 4 are at least as broad as that provided by the First Amend., U.S. CONST.
Because the Florida protection is at least as broad as that of the First Amendment, Fla. Stat. 794.03 violates the Florida Constitution as well as the First Amendment.
CONCLUSION
State statutes, even those addressing legitimate state concerns, must yield to the supreme authority of the Federal Constitution's guarantee of press freedom. See, e.g., Landmark Communications, Inc., v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978); Gardner v. Bradenton Herald, Inc., 413 So.2d 10 (Fla. 1982).
This opinion leaves unanswered the question of how the state will protect alleged sexual assault victims against a disclosure of their identities. The need for a criminal statute with punitive sanctions for such disclosures is deemed necessary by the legislatures of only four states, Florida, Georgia, South Carolina and Wisconsin. See Cox Broadcasting Corporation v. Cohn, 420 U.S. 469, 471, footnote 1, 95 S.Ct. 1029[, 1034, footnote 1, 43 L.Ed.2d 328] (1975). The fact that *1076 forty-six states are able to conduct sexual assault investigations and trials without punishing the press criminally for a disclosure of the victim's identity is, in itself, a circumstance which leads this court to conclude that the state's expressed concerns about a victim's safety and privacy are somewhat exaggerated and overblown. The State has selected a weak factual scenario to demonstrate such concerns. Miss Bowman was not in any real, potential danger and surely she must have realized that charges would be filed and that she would have to testify in public, and in Florida, to attend a deposition at the instance of defense counsel. Or did the police and prosecutor tell her such things?
Local attorney Scott Richardson, an experienced defense attorney and former prosecutor, testified that the state names adult sexual assault victims in the information filed with the clerk at the commencement of legal proceedings. Probable cause affidavits and police reports are routinely released with the victim's name appearing on the face of the document. Richardson can recall no instance where a prosecution has been commenced under this statute in Palm Beach County. Neither can I recall such a prosecution.
The privacy rights of Miss Bowman, from a criminal prosecution standpoint, are not even her's [sic] to command; her so-called rights belong to the State Attorney. His unfettered discretion, whether to go public, and when, his decision to prosecute, or not, is virtually absolute. What a paternalistic, constitutional abode the state invites us to dwell in.
The state has at all times assumed that the burden was on the defendant to show that the state's interests in keeping Miss Bowman's identity confidential were not of the highest order to prevail on the issue of constitutional overbreadth. On reflection, and having written the bulk of this opinion some days earlier, I think that such an approach turns the First Amendment upside down. This is, after all, a penal statute absolute in its terms, and in the nature of a "prior restraint". We know that a prior restraint requires a showing of the "highest form of state interest to sustain its validity." Nebraska Press Association v. Stuart, 427 U.S. 539, 565-66 [96 S.Ct. 2791, 2806, 49 L.Ed.2d 683]; Smith v. Daily Mail, 443 U.S. 97, 101-2 [99 S.Ct. 2667, 2670, 61 L.Ed.2d 399]; Gardner v. Bradenton Herald, Inc., 413 So.2d 10, 11. In an attempt to show that its interests were "of the highest order", that criminal proceedings are necessary, and that no other sanctions or actions are appropriate in this case, the state makes the same timeworn arguments made and rejected in the The Florida Star, [491 U.S. 524, 536] 109 S.Ct. 2603, 2611, [105 L.Ed.2d 443] and in the Daily Mail, Landmark Communications, Bradenton Herald and Globe Newspaper cases. The state has thus failed to carry its burden of sustaining its actions in taking the extreme step of criminal prosecution.
Having concluded that Fla. Stat. 794.03 is unconstitutional on its face, and as applied, it is
ORDERED that Defendant, THE GLOBE COMMUNICATIONS, CORP.'s Motion to Dismiss is GRANTED and the prosecution begun by the instant information and notice to appear is DISMISSED.

OUR REVIEW
The trial court's ruling as to the facial invalidity of section 794.03 under the First Amendment rested on three separate legal concepts: (1) overbreadth; (2) prior restraint; and (3) underinclusiveness.

OVERBREADTH AND PRIOR RESTRAINT[2]
The trial court declared section 794.03 unconstitutionally overbroad because the statute imposes an absolute and blanket prohibition on the publication of information that is truthful, lawfully obtained and involves a matter of public interest. *1077 For the most part, we conclude this holding is sound, and the cases cited by the court support that position. However, in an effort to be thorough, we make the following observations.
The First Amendment to the United States Constitution provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
The restrictions of this amendment have been extended to the various state governments by the enactment of the Fourteenth Amendment. Hence, freedom of speech, and of the press, is protected in Florida by the First Amendment as well as by Article I, Section 4 of the Florida Constitution, which contains similar protections.
Because of the obvious importance of the free exchange of information in a democratic society, the First Amendment strictly limits any government activity that might impede that exchange. While the right of free speech is not absolute, the United States Supreme Court has permitted restrictions on its exercise only to the extent that the restrictions are narrowly tailored to serve identifiable and compelling state interests. In other words, the state must have a very good reason to restrict speech of any kind, and even then must be careful that its restriction is narrowly crafted and contains only those provisions necessary to serve its limited purpose. E.g., Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (government may impose reasonable restrictions on time, place, or manner of protected speech, provided the restrictions are, inter alia, narrowly tailored to serve a significant government interest); Police Dep't of the City of Chicago v. Mosley, 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972) (citing Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) for the proposition that "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives."). Accordingly, the means adopted by a state to protect its legitimate interests in restricting speech must be narrowly tailored to serve those interests, rather than broadly written to impair other legitimate speech not threatening to those interests. This is the essential question in an "overbreadth" analysis of a state restriction on speech.
Initially, we note that the trial court stated, "The U.S. Supreme Court has held that Fla. Stat. 794.03 is unconstitutionally overbroad in [The Florida Star]." See supra at 1072-1073. While this may be functionally accurate, it is not technically correct. In The Florida Star, the Supreme Court never says that section 794.03 is unconstitutionally overbroad; rather, the Court bars the per se civil negligence remedy inferred from a violation of the statute, and limits its holding to the circumstances of the case.
In The Florida Star, the Supreme Court applied a constitutional test it had earlier announced in Smith v. Daily Mail Publishing Co., 443 U.S. 97, 103, 99 S.Ct. 2667, 2671, 61 L.Ed.2d 399 (1979). In that case the Court adopted a strict test for determining when the government may restrict publication:
[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.
In the instant case, following the Supreme Court's example in The Florida Star, the trial court correctly determined that section 794.03 fails the Daily Mail test because it imparts criminal punishment automatically, even to truthful information, lawfully obtained, about a matter of public concern, without any discrete determination of whether the prohibition on publication is justified under the particular circumstances presented. In our view, this is the essence of the holding in The Florida Star.
In The Florida Star, the Court stated:
A second problem with Florida's imposition of liability for publication is the broad sweep of the negligence per se *1078 standard applied under the civil cause of action implied from § 794.03... . [C]ivil actions based on § 794.03 require no case-by-case findings that the disclosure of a fact about a person's private life was one that a reasonable person would find highly offensive. On the contrary, under the per se theory of negligence adopted by the courts below, liability flows automatically from publication. This is so regardless of whether the identity of the victim is already known throughout the community; whether the victim has voluntarily called public attention to the offense; or whether the identity of the victim has otherwise become a reasonable subject of public concern  because, perhaps, questions have arisen whether the victim fabricated an assault by a particular person. Nor is there a scienter requirement of any kind under § 794.03, engendering the perverse result that truthful publications challenged pursuant to this cause of action are less protected by the First Amendment than even the least protected defamatory falsehoods: those involving purely private figures, where liability is evaluated under a standard, usually applied by a jury, of ordinary negligence. [Citation omitted]. We have previously noted the impermissibility of categorical prohibitions upon media access where important First Amendment interests are at stake. See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 608, 102 S.Ct. 2613, 2620-21, 73 L.Ed.2d 248 (1982) (invalidating state statute providing for the categorical exclusion of the public from trials of sexual offenses involving juvenile victims.) More individualized adjudication is no less indispensable where the State, seeking to safeguard the anonymity of crime victims, sets its face against publication of their names.
491 U.S. at 539, 109 S.Ct. at 2612. Just as with the case of per se civil liability involved in The Florida Star, criminal sanctions mandated by section 794.03 flow automatically with any publication, regardless of the circumstances. Hence, the fundamental defect in the statute's "broad sweep" as identified in The Florida Star is even more egregious in the criminal context than in a civil setting.[3]
For instance, as noted in The Florida Star, it is apparent on the face of the statute that it applies to the dissemination of information regardless of the manner in which it was obtained. 491 U.S. at 538-39, 109 S.Ct. at 2612. That is, for example, even if the information is lawfully obtained from the government, as it was obtained from the sheriff in The Florida Star, or if it was obtained from a court record, the statute still requires that the publisher be punished. This anomaly departs from long-standing judicial precedent making clear that punishment cannot ordinarily be imposed where the published information is already a matter of public record. See id. 491 U.S. at 534-35, 109 S.Ct. at 2610 and cases discussed therein.
On appeal, the state has posed the same three interests that were advanced in The Florida Star as purportedly served by section 794.03 in order to justify its restrictions: (1) the privacy rights of the victim; (2) victim safety from retaliation; and (3) encouraging victims to report sexual offenses. While the legitimacy of these concerns is apparent, the question is whether section 794.03 has been narrowly drawn to serve these interests. It appears the Supreme Court has already answered this question with a resounding "no" in The Florida Star.
Assuming that the state's protection of the privacy rights of the victim is an interest of the "highest order," it is apparent that these rights could be served by measures less drastic than automatic criminal punishment for any publication. The Florida Star opinion points out many of the legitimate situations covered by the statute where an outright ban on publication cannot be constitutionally justified. Id. 491 U.S. at 539, 109 S.Ct. at 2612. In addition *1079 to these examples, it would appear that the statute criminalizes other situations as well: (1) where the rape allegations were false; (2) where the publication was accidental or inadvertent (i.e., not "knowingly" published); or (3) where the information is obtained from public records.
The required "individualized adjudication" referred to by the The Florida Star Court would require the limitation of sanctions to extremely narrow and clear-cut circumstances capable of ascertainment on a case-by-case basis. For instance, a determination by the state to maintain confidentiality within its own ranks and records, and a provision for sanctions upon breach, might constitute a less drastic measure more narrowly tailored to serve the state's interest in safeguarding a victim's privacy. See The Florida Star, 491 U.S. at 538, 109 S.Ct. at 2611; see also Investigation: Florida Statute 27.04, Subpoena of Roche v. State, 589 So.2d 978 (Fla. 4th DCA 1991), rev. denied, 599 So.2d 1279 (Fla. 1992), and cert. denied, ___ U.S. ___, 113 S.Ct. 1027, 122 L.Ed.2d 172 (1993). The inclusion of such narrowly drawn standards would necessarily facilitate the case-by-case adjudication vital to the survival of the statute. However, the statute as presently drafted is simply not narrowly tailored to serve the state's interest in protecting the victim's privacy. Instead, it uses a shotgun when a highly accurate rifle is required.
The same analysis applies to the state's asserted interest in the victim's safety. Obviously, there may be instances where the sexual offense assailant may be, for a period of time, "on the loose," so the fear of retaliation may be great. For instance, the victim in The Florida Star testified at her trial that, after her name was published, her mother received threatening phone calls from a man who stated he would rape her again. 491 U.S. at 528, 109 S.Ct. at 2606. However, it is equally apparent that there will be situations where that is not the case, as where the alleged offender has been apprehended. Since the statute makes no allowance for such situations, it is clearly not narrowly tailored to serve the interest of victim safety.
Furthermore, the state has made no contention or attempted to demonstrate that victim safety is of any greater concern in sexual offense cases than with many other violent crimes, such as domestic assault. This uneven treatment diminishes the strength of the state's assertion that this is an interest of the "highest order."
The above discussion may also be applied to the state's asserted interest in encouraging victims to report sexual assaults. In Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), one of the interests asserted by Massachusetts to justify a statute that mandated closure of the courtroom during the testimony of a minor victim of a sexual offense was to encourage such victims to come forward. 457 U.S. at 607, 102 S.Ct. at 2620. The Court found that, not only was there no empirical data to support the claim that automatic closure increased the number of minor sex victims coming forward, but also recognized that the
same interest could be relied on to support an array of mandatory closure rules designed to encourage victims to come forward: Surely it cannot be suggested that minor victims of sex crimes are the only crime victims who, because of the publicity attendant to criminal trials, are reluctant to come forward and testify. The State's argument based on this interest therefore proves too much... .
457 U.S. at 610, 102 S.Ct. at 2622 (emphasis in original).
Similarly, in this case, the state has failed to provide any empirical evidence demonstrating how a blanket prohibition on the publication of information identifying a sexual offense victim has affected the number of such reports in this state. The only data introduced into evidence below is that the number of reported incidents has increased in both Florida and the nation as a whole, but there is no nexus established between the increase in reports and the statute involved herein. The state has also failed to address the issue of whether this concern, as well as the others discussed above, could be addressed by other, less restrictive, means.
In sum then, because criminal liability, like the civil liability in The Florida Star, *1080 flows automatically under section 794.03 upon publication, regardless of the circumstances, and even though the broad ban on publication may not be necessary to effectuate the state's interests, the statute fails the strict tests for overbreadth set out in The Florida Star and Daily Mail and, therefore, is patently violative of the First Amendment.

STATE'S RESPONSE TO OVERBREADTH PROBLEM
Notwithstanding the above, the state contends this court can transform the "problems" noted herein, and by The Florida Star Court, into affirmative defenses, so that the statute's constitutionality can be salvaged. The state directs us to a number of instances where Florida courts have, without legislative sanction, created affirmative defenses to avoid a variety of constitutional problems. E.g., Herrera v. State, 594 So.2d 275, 277 (Fla. 1992) (recognizing entrapment as a judicially created affirmative defense designed to protect a defendant from being found guilty of a crime where the government instigated the conduct); State v. Glosson, 462 So.2d 1082 (Fla. 1985) (due process defense to government misconduct); Smith v. State, 424 So.2d 726 (Fla. 1982) (defense of withdrawal), cert. denied, 462 U.S. 1145, 103 S.Ct. 3129, 77 L.Ed.2d 1379 (1983).
By its plain terms, the statute's ban on publication is absolute and unequivocal: "No person shall print... ." (Emphasis added). Criminal prosecution flows automatically from the statute. There is no indication the legislature intended any "ifs, ands, or buts" to be read into the statute's unambiguous language. Yet, this is exactly what the state would have this court do, make the prohibition on publication contingent on an endless number of factual situations. That would involve nothing short of pure judicial legislation. After adding all of the state's ingredients to the mix, the statute would be transformed from an "apple" to an "orange" and we still could not be certain it would pass constitutional muster. None of the above-cited cases stands for the proposition that a court may rewrite a statute in this manner, and no reasonable construction of the statute's present language could authorize such tampering.
In rejecting the state's position, we have not overlooked the rule of statutory construction that a statute should be construed, if at all possible, to avoid conflict with the Constitution. E.g., Schultz v. State, 361 So.2d 416 (Fla. 1978). However, it is a time-honored principle of Florida law that it is not the role of a court to rewrite a statute. Brown v. State, 358 So.2d 16 (Fla. 1978); see also Aptheker v. Secretary of State, 378 U.S. 500, 515, 84 S.Ct. 1659, 1668, 12 L.Ed.2d 992 (1964) ("`[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute * * *' or judicially rewriting it.") (quoting Scales v. United States, 367 U.S. 203, 211, 81 S.Ct. 1469, 1477, 6 L.Ed.2d 782 (1961)).
Reduced to its essence, the state's argument simply makes more glaring the fact that section 794.03 is hopelessly overbroad in its application to constitutionally protected activity, and incapable of any saving construction.

UNDERINCLUSIVENESS
In The Florida Star, the Supreme Court reasoned that section 794.03 was also flawed because it was underinclusive in its application to disseminators of the protected information. The Court declared that when a state attempts to punish publication in the name of privacy, it must apply the prohibition evenhandedly, to the small-time disseminator (like a backyard gossip), as well as the media giant. The trial court adopted The Florida Star reasoning on this issue, and we agree with the court's analysis on that point.
Such "underinclusiveness" obviously undermines the alleged purpose of the statute and diminishes the strength of the state's alleged interests. The state can hardly claim that the protection of this information is an interest "of the highest order" when it permits the information to be disseminated *1081 with impunity by means other than the mass media. In addition, this uneven treatment would appear especially violative of the federal and state protections of freedom of the press. The statute, in effect, singles out the "press," the most apparent "instrument of mass communication," for special punitive treatment, while it leaves the dissemination of the same information by other means completely untreated.
We also note that the phrase "instrument of mass communication," the identifying phrase triggering the underinclusive debate, is so ambiguous that it may also render the statute void-for-vagueness. See generally Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972) (discussing the void-for-vagueness doctrine). Does it apply to anyone with access to a copy machine or megaphone as well as to a major newspaper, television and radio? Although not addressed by the trial court's order, this problem stems from the legislature's failure to define the phrase, as well as the phrase's inherent ambiguity. If left intact, juries would have to determine the meaning of the phrase on an ad hoc basis, inevitably leading to highly unpredictable results.

ARTICLE I, SECTION 4
For the reasons expressed in the trial court's opinion, we also agree with the court's conclusion that section 794.03 violates Article I, Section 4 of the Florida Constitution, which provides:
Freedom of speech and press.  Every person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for defamation the truth may be given in evidence. If the matter charged as defamatory is true and was published with good motives, the party shall be acquitted or exonerated.
As noted by the trial court, this provision provides at least the same protection as that provided by the First Amendment to the United States Constitution. See supra at 1075.

CONCLUSION
Finding ourselves in substantial accord with the trial court's order, and for the additional reasons set out above, we affirm the trial court's holding that section 794.03, Florida Statutes (1987), both as it is written and as applied here, is violative of the free speech and free press provisions of the Constitutions of the United States and the State of Florida.
HERSEY and WARNER, JJ., concur.
NOTES
[1] We have jurisdiction under the Florida Constitution, Article V., Section 4(b)(1); Section 26.012(1), Florida Statutes (1991); and Rule 9.030(b)(1)(A), Florida Rules of Appellate Procedure (1993).
[2] We agree with the trial court's discussion and resolution of the prior restraint issue and will not discuss it further herein.
[3] Indeed, the dissent in The Florida Star acknowledges that an award of punitive damages based upon a violation of the statute represented a more "troublesome" issue than the allowance of compensatory damages. 491 U.S. at 553 n. 5, 109 S.Ct. at 2619 n. 5 (White, J., dissenting).