648 So.2d 110 (1994)
STATE of Florida, Appellant,
v.
GLOBE COMMUNICATIONS CORPORATION, Appellee.
No. 82377.
Supreme Court of Florida.
December 8, 1994.
*111 Robert A. Butterworth, Atty. Gen., and Richard L. Polin, Asst. Atty. Gen., Miami, for appellant.
John F. Tierney, III and Carey Haughwout of Tierney & Haughwout, West Palm Beach, for appellee.
Richard J. Ovelmen of Baker & McKenzie, Miami, and George K. Rahdert of Rahdert & Anderson, St. Petersburg, amici curiae for The Times Publishing Co., The Associated Press, Society of Professional Journalists, The Miami Herald Pub. Co., National Broadcasting Co., Inc., The New York Times Co., The American Civ. Liberties Union, The Reporters Committee for Freedom of the Press, The Florida First Amendment Foundation, and Gannett Co., Inc.
KOGAN, Justice.
The State appeals State v. Globe Communications Corp., 622 So.2d 1066 (Fla. 4th DCA 1993), in which the Fourth District Court of Appeal declared section 794.03, Florida Statutes, which mandates criminal sanctions for identifying a victim of a sexual offense in any instrument of mass communication, facially unconstitutional under both the United States and Florida Constitutions.[1] We affirm.
Globe Communications Corporation (Globe) was charged with two counts of printing, publishing, or causing to be printed or published in an instrument of mass communication the name, photograph, or other identifying facts or information of the victim of a sexual offense, in violation of section 794.03, Florida Statutes (1989). That section provides:
No person shall print, publish, or broadcast, or cause or allow to be printed, published, or broadcast, in any instrument of mass communication the name, address, or other identifying fact or information of the victim of any sexual offense within this chapter. An offense under this section shall constitute a misdemeanor of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
The charges resulted from the Globe's identification of the Palm Beach woman William Kennedy Smith allegedly raped in 1991. In its April 23, 1991 issue and again in its April 30, 1991 issue the Globe published the alleged victim's name and other identifying information, contrary to section 794.03. The Globe had lawfully learned of the alleged victim's identity through standard investigative techniques. Prior to the Globe's identification of the woman, at least four British newspapers had published articles identifying her as Smith's alleged victim.
The Globe filed a motion to dismiss the information arguing that section 794.03 violates *112 the free speech and press provisions of both the First Amendment to the United States Constitution and article I, section 4 of the Florida Constitution. The Globe maintained that the statute is unconstitutional both on its face and as applied in this case. The trial court accepted both arguments and dismissed the information.
On appeal to the district court, the State conceded that the record supported the ruling that section 794.03 is unconstitutional as applied to Globe. Thus, the only issue before the district court was the facial constitutionality of the statute. 622 So.2d at 1067. Noting its general agreement with the trial court's opinion, which it quoted in full, the district court affirmed.
Both the trial and district courts relied extensively on the United States Supreme Court's decision in Florida Star v. B.J.F., 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989). In Florida Star, a rape victim brought a civil suit against The Florida Star, a weekly newspaper, for publishing her name in violation of section 794.03, Florida Statutes (1987). The newspaper had obtained the victim's name from a publicly released police report. The Supreme Court held that The Florida Star could not be subjected to civil liability under section 794.03 for publishing truthful information that had been lawfully obtained. In reaching this conclusion, the Court looked to the principles articulated in Smith v. Daily Mail Publishing Co., 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), for analyzing a state's attempts to punish truthful publication.
Under the Daily Mail standard, "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." Daily Mail, 443 U.S. at 103, 99 S.Ct. at 2671. Applying this standard, The Florida Star could not be held civilly liable under section 794.03, Florida Statutes (1987), unless the statute was narrowly tailored to further a state interest of the highest order. The Supreme Court concluded that the same interests relied on by the State in this case  the privacy of victims of sexual offenses; the physical safety of victims; and encouraging victims to report sexual offenses  were not sufficiently furthered by the automatic imposition of civil sanctions under the statute to establish a "need" within the meaning of Daily Mail for such extreme measures. 491 U.S. at 537, 109 S.Ct. at 2611.
We agree with Judge Anstead, writing for the majority below, that the "essence" of the holding in Florida Star is that a state may not automatically impose liability for the publication of lawfully obtained truthful information about a matter of public concern. Before liability can be imposed, the state must provide for a "discrete determination of whether the prohibition on publication is justified under the particular circumstances presented." 622 So.2d at 1077. As explained by the Supreme Court, a major problem with imposition of liability for publication under Florida's statute
is the broad sweep of the negligence per se standard applied under the civil cause of action implied from § 794.03... . [C]ivil actions based on § 794.03 require no case-by-case findings that the disclosure of a fact about a person's private life was one that a reasonable person would find highly offensive. On the contrary, under the per se theory of negligence adopted by the courts below, liability follows automatically from publication. This is so regardless of whether the identity of the victim is already known throughout the community; whether the victim has voluntarily called public attention to the offense; or whether the identity of the victim has otherwise become a reasonable subject of public concern  because, perhaps, questions have arisen whether the victim fabricated an assault by a particular person. Nor is there a scienter requirement of any kind under § 794.03, engendering the perverse result that truthful publications challenged pursuant to this cause of action are less protected by the First Amendment than even the least protected defamatory falsehoods: those involving purely private figures, where liability is evaluated under a standard, usually applied by a jury, of ordinary negligence. We have previously noted the impermissibility of categorical *113 prohibitions upon media access where important First Amendment interests are at stake. More individualized adjudication is no less indispensable where the State, seeking to safeguard the anonymity of crime victims, sets its face against publication of their names.
491 U.S. at 539, 109 S.Ct. at 2612 (citations omitted).
Another deficiency recognized by the Supreme Court is the "facial underinclusiveness" of section 794.03, which raises "serious doubts" about whether the statute is serving the significant interests urged by the State in support of affirmance. 491 U.S. at 540, 109 S.Ct. at 2612. As explained by the Court,
[s]ection 794.03 prohibits the publication of identifying information only if this information appears in an "instrument of mass communication," a term the statute does not define. Section 794.03 does not prohibit the spread by other means of the identities of victims of sexual offenses. An individual who maliciously spreads word of the identity of a rape victim is thus not covered, despite the fact that the communication of such information to persons who live near, or work with, the victim may have consequences as devastating as the exposure of her name to large numbers of strangers.
When a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant. Where important First Amendment interests are at stake, the mass scope of disclosure is not an acceptable surrogate for injury. A ban on disclosures effected by "instrument[s] of mass communication" simply cannot be defended on the ground that partial prohibitions may effect partial relief. Without more careful and inclusive precautions against alternative forms of dissemination, we cannot conclude that Florida's selective ban on publication by the mass media satisfactorily accomplishes its stated purpose.
491 U.S. at 540-41, 109 S.Ct. at 2612-13 (citations omitted).
We agree with the trial court and district court below that the "broad sweep" and "underinclusiveness" of section 794.03 are even more troublesome when the statute is used to mandate criminal sanctions. In an attempt to avoid the obvious conclusion that these facial defects render the statute invalid under both the First Amendment and article I, section 4 of the Florida Constitution, the State asks us to effectively rewrite section 794.03. The State asks us to read various affirmative defenses into the statute and to adopt appropriate jury instructions to narrow the sweep of the statute. As to the underinclusiveness problem, the State asks us to construe the term "instrument of mass communication" to include both media giants and non-media individuals who broadcast the victim's identity through non-media instruments, such as megaphones, fliers, and facsimile machines.
The State is correct that whenever possible we will construe a statute so as not to conflict with the constitution. Firestone v. News-Press Publishing Co., 538 So.2d 457, 459 (Fla. 1989). We will resolve all doubts as to the validity of the statute in favor of its constitutionality, provided we can give the statute a fair construction that is consistent with the Florida and federal constitutions and with legislative intent. State v. Stalder, 630 So.2d 1072, 1076 (Fla. 1994); State v. Elder, 382 So.2d 687, 690 (Fla. 1980). Unlike Florida's Hate Crime Statute,[2] which we were able to uphold against First Amendment challenge in State v. Stalder by giving the statute a narrowing construction, extensive rewriting and broadening of the statute's scope would be required to rehabilitate section 794.03. Rewriting would be necessary because numerous affirmative defenses, which are entirely absent from the statute, would have to be added and defined by the Court. And, as noted by Judge Anstead, "[t]here is no indication the legislature intended any `ifs, ands, or buts' to be read into the statute's unambiguous language." 622 So.2d at 1080. Similarly, we cannot say that *114 expanding the scope of the statute to include publications by non-media individuals would be consistent with legislative intent. Although we decline to rewrite section 794.03 to correct the defects outlined in Florida Star, we do not rule out the possibility that the legislature could fashion a statute that would pass constitutional muster.
Accordingly, we affirm the district court's decision holding section 794.03 facially invalid under the free speech and free press provisions of both the United States and Florida Constitutions.
It is so ordered.
GRIMES, C.J., and SHAW, HARDING and WELLS, JJ., concur.
OVERTON, J., concurs in result only.
NOTES
[1] We have mandatory jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] Section 775.085, Florida Statutes (1989).